# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CC-00353-SCT

*AT&T CORP.*

*v.*

*MISSISSIPPI DEPARTMENT OF INFORMATION TECHNOLOGY SERVICES*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/13/2019 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| TRIAL COURT ATTORNEYS: | MICHAEL B. WALLACE |
| | REBECCA L. HAWKINS |
| | MARK F. McINTOSH |
| | PAUL E. BARNES |
| | TOMMY D. GOODWIN |
| | M. PATRICK McDOWELL |
| COURT FROM WHICH APPEALED: | CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY |
| ATTORNEYS FOR APPELLANT: | MICHAEL B. WALLACE |
| | REBECCA HAWKINS |
| | MARK F. McINTOSH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: TOMMY D. GOODWIN |
| | JAMES E. WOODS, JR. |
| | PAUL E. BARNES |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 04/16/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., COLEMAN AND GRIFFIS, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The Mississippi Department of Information Technology Services (ITS) issued a Request for Proposals (RFP) for telecommunications services. After vendors responded, ITS selected the proposal submitted by Telepak Networks, Inc., d/b/a C Spire (C Spire) for a

statewide voice and data network. AT&T Corp. (AT&T) protested the award, arguing that ITS's award of the contract to C Spire was erroneous because C Spire's proposal did not match the specifications set forth in the RFP. ITS denied AT&T's challenge, and it appealed. The Chancery Court of the First Judicial District of Hinds County affirmed, finding that ITS's award of the contract to C Spire was not arbitrary and capricious or unsupported by substantial evidence. AT&T appeals. We hold that the ITS decision that C Spire's proposal matched the RFP's specifications was supported by substantial evidence and was not arbitrary and capricious. Therefore, we affirm.

**FACTS**

¶2. The Mississippi Legislature established ITS to "provide statewide services that facilitate cost-effective information processing and telecommunication solutions." Miss. Code Ann. § 25-53-1 (Rev. 2018). ITS has authority to purchase telecommunications services for all of state government. *Id.* Mississippi Code Section 25-53-101 provides,

> The Legislature hereby declares it essential to the creation and maintenance of an efficient, modern, economically feasible, telecommunications system that there should be full cooperation and cohesive planning and effort by and between the several state agencies and that it is the responsibility of the said Legislature to provide statutory authority therefor. The Legislature, therefore, declares and determines that the responsibility for these and other related purposes shall be vested in the Mississippi Department of Information Technology Services.

Miss. Code. Ann. § 25-53-101 (Rev. 2018). Further,

¶3. The Mississippi Department of Information Technology Services shall administer the provisions of Sections 25-53-109 through 25-53-125. The purposes and aims of the Mississippi Department of Information Technology Services in carrying out said provisions shall be to coordinate and promote efficiency in the acquisition, operation and maintenance of all

2

telecommunications systems and networks being used by agencies of the state and further to coordinate the compatibility of systems and networks to the state with those of governing authorities so as to promote a uniform, compatible telecommunications system for agencies and governing authorities.

Miss. Code. Ann. § 25-53-105 (Rev. 2018). ITS has statutory authority to enact "rules, regulations, and procedures governing the acquisition of computer and telecommunications equipment and services . . . ." Miss. Code Ann. § 25-53-5(d) (Rev. 2018). In fulfilling its statutory duties, ITS must consider "current information about state telecommunications activities in relation to the full range of emerging technologies." Miss. Code Ann. § 25-53-111(*l*) (Rev. 2018).

¶4.     Mississippi Code Section 25-53-5(o) (Rev. 2018) provides that "[a]ll acquisitions of computer equipment and services . . . shall be based upon competitive and open specifications . . . ." When ITS accepts a bid on an RFP, "it shall be that which is the lowest and best." Miss. Code Ann. § 25-53-5(o). According to the ITS Procurement Handbook's guidance on RFPs,

> ITS uses the Request for Proposals (RFP) as the instrument of choice for obtaining competitive pricing and offerings in compliance with this state statute. The RFP outlines the functional requirements for the equipment, software, and services needed, and vendors respond by proposing solutions and pricing that satisfy these requirements. Proposals and vendors are evaluated in terms of the ability of the solution to satisfy the stated requirements and best meet the needs for the purchasing agency over the expected life of the equipment or system. The evaluation is based on predefined evaluation criteria in which price is not the only factor. Some of the criteria for assessing proposals received are necessarily subjective. It is the responsibility of ITS and the purchasing entity to ensure the evaluation process is fair and defensible.

¶5.     On August 9, 2017, ITS published RFP 5000, which requested proposals in eleven "functional categories" of telecommunications services. RFP 5000 provided a proposed project implementation start-up date of January 1, 2018, and indicated that the project was set to go live on June 30, 2019. The State wanted all contracts in place by December 31, 2017. The standard contract for RFP 5000 had an initial term of eight years; after the initial term, it could be renewed upon the parties' written agreement "for two (2) additional two (2) year terms, or such other period of time as is mutually agreed upon."

¶6.     A mandatory vendor conference occurred on August 22, 2017. ITS posted answers to vendors' written questions on September 11, 2017. Then, contract negotiation occurred. On December 13, 2017, ITS published a notice of award for the RFP, and the ITS Board approved it on December 21, 2017. Category I, Voice and Data Network, was awarded to C Spire. AT&T's total proposal for voice and data was $156,574,237, and C Spire's was $123,765,555. Therefore, C Spire's total voice and data proposal was approximately $32.8 million cheaper than AT&T's. For voice, C Spire's proposal was $51,035,520, and AT&T's was $33,085.312.32. For data, C Spire's proposal was $65,043,648, and AT&T's was $117,752,532.48. C Spire also was awarded Category VI, Hosted Voice over Internet Protocol (VoIP).

*AT&T's Protest*

¶7.     AT&T, the incumbent voice and data contract holder, filed a protest against the award of the contract for Category I to C Spire. In its protest letter, AT&T argued, *inter alia*, that

4

C Spire's proposal for Category I did not meet the RFP's specifications for voice service.

The RFP for Category I provided,

> In 2005, RFP 4000 was awarded to BellSouth Communications[1] to provide statewide voice services and data network connectivity. This RFP has been used by the various logical entities of the State. These logical entities include state agencies, libraries, institutions of higher learning, community colleges, K-12 schools, and local governments. It is the State's intent to replace the existing contract with a new contract for statewide voice services and data network connectivity.

AT&T argued that C Spire's proposal did not match the RFP's specification for Centrex. The RFP defined Centrex as follows:

> Centrex - A business telephone service offered by the local exchange company (LEC) from a local central office. The word "Centrex" has become the industry standard name for this type of service. To accommodate the State Centrex nodes the Vendor must provide points of presence in similar geographic locations, as they exist.

The RFP made the provision of Centrex, as defined above, a mandatory requirement.

¶8.     The C Spire proposal accepted by ITS offered Centrex Platinum, a voice service that was described by the chancellor as "a hybrid service that uses fiber to transmit telephone calls from the C Spire network facility to the customer's building. The fiber-based telephone service then converts to a traditional, copper-based telephone service" once it reaches the building. As the chancellor found, "[t]his type of hybrid telephone service permits for the use of innovative fiber technology by the telephone service provider on its end (i.e., its 'platform') while allowing the customer to still utilize its building's existing copper-wire telephone lines and analog telephones."

---

[1] BellSouth was AT&T's predecessor. Under the contract negotiated after RFP 4000 in 2005, AT&T was and is the state's voice and data services provider.

¶9.    In its protest, AT&T contended that C Spire's Centrex Platinum did not meet the RFP's specifications for Centrex. First, AT&T argued that ITS had specified at the vendor conference that one of its goals was to maintain the same level of service provided by AT&T, the incumbent contractor. Because AT&T currently provides the state with TDM-based Centrex[2] and Centrex Platinum is not TDM-based, AT&T contended that Centrex Platinum was not Centrex as specified in the RFP. Essentially, AT&T argued that, because Centrex Platinum was not traditional copper-wire telephone service, it was noncompliant with the RFP specifications. AT&T also argued that Centrex Platinum actually was Hosted VoIP, which was bid in Category VI, not Category I.

¶10.    Finally, AT&T argued that the RFP specified that each vendor must comply with all mandatory requirements on the date of the vendor's proposal submission. AT&T argued that because C Spire would need a lengthy buildout process before completing installation of Centrex Platinum, it would be unable to offer Centrex Platinum on the day it submitted its proposal. Therefore, AT&T argued, C Spire's proposal did not comply with the RFP.

*ITS Executive Director's Decision*

¶11.    The executive director of ITS, "[a]fter a deliberate and thorough review of the record," rejected AT&T's protest and upheld ITS's award of the contract for Category I to C Spire. The executive director recognized the goals that ITS had set forth in RFP 5000, Section VII, Item 3.2:

_____

[2] The executive director's decision provided the following definition of TDM: "a technique for transmitting a number of separate data, voice, and/or video signals simultaneously over one communications medium by interleaving a piece of each signal one after another." (quoting *TDM*, Newton's Telecom Dictionary (17th ed. 2001)).

The current telecommunications contract has served the State well, but the State must now look at future needs and technologies to ensure that Mississippi government and public education remain competitive. It is the desire of ITS to expand and build upon past successes under a new contract while not accepting less in the technology and the service support model that the State has worked hard to achieve. The State of Mississippi recognizes and acknowledges that new competition now exists for many telecommunications service offerings. The State of Mississippi is committed to taking advantage of this competition for its benefit. . . . The primary objectives of this RFP are to obtain high quality, reliable telecommunication services for all State entities at the lowest possible cost and to expend State funds in such a manner as to promote enhancements to the State's telecommunication infrastructure that will result in better services for the State's private customers, business/industry, and citizenry.

The executive director also noted the ITS regulation that provides that a vendor's protest attacking the State's assessment of its own needs will be rejected as without merit.

¶12. Regarding Centrex service, the executive director found that the RFP did not specify that the Centrex service had to be TDM-based. For that reason, the executive director rejected AT&T's argument that the Centrex provided by the winning vendor had to be TDM-based like the Centrex service currently provided by AT&T. The executive director recognized that the definition of Centrex in the RFP said it is "telephone service offered by the local exchange company (LEC) from a local central office" and that this definition has become industry standard for this type of service. And the executive director found that, while ITS had said to vendors that it wanted to maintain the same level of service, the concept of level of service is different from technique of service. Bidders were free to diverge from TDM-based Centrex as long as they provided the same features currently

7

provided by the State's current Centrex, such as "three-way calling, caller ID, call forwarding, etc."[3]

¶13.    Next, the executive director rejected AT&T's argument that the Centrex Platinum service offered by C Spire in Category I really was Hosted VoIP, which was bid in Category VI. AT&T argued that, if ITS had not wanted a TDM-based solution in Category I, it would not have needed to include a separate category for Hosted VoIP. The executive director found that RFP 5000 specified that Category I and Category VI were separate categories. The executive director found that Category I requested a solution, such as Centrex Platinum, that would allow the State to continue using its existing equipment for voice services. But Category VI, Hosted VoIP, would not let the State use its existing equipment, but rather it would require the State to rewire and replace all existing equipment in its buildings for delivery of voice services via Hosted VoIP. Thus, Centrex Platinum is not Hosted VoIP.

¶14.    The executive director found that C Spire had offered

> a Centrex solution comprised of a fiber and copper delivery system. This solution, called Centrex Platinum by C Spire, plainly meets the definition as well as the features and services of Centrex as set forth in RFP 5000. This solution is, in fact, a "business telephone service offered by the local exchange company (LEC) from a local central office." Further, and not insignificantly, C Spire's solution falls within the aforementioned "full range of emerging technologies" for which ITS is bound to endeavor.

The executive director found that AT&T's argument that RFP 5000 had specified a TDM-based solution was an improper attempt to rewrite RFP 5000 in order to challenge the procurement process.

---

[3] AT&T does not renew its argument about TDM on appeal.

8

¶15.  The executive director also rejected AT&T's argument that C Spire's proposal did not match the readiness specifications of RFP 5000. The readiness requirement was imposed by the answer to Question 51 of the Questions and Clarifications Memorandum, which said that "vendors must be able to meet mandatory requirements at the time of the RFP proposal submission." The executive director recognized that AT&T interpreted this answer to mean that RFP 5000 required "vendors to be able to provide the telecommunications services literally at the time each vendor submitted its proposal." The executive director further explained that, "[i]n other words, AT&T asserts that unless a vendor already had in place all of the cabling, wiring, equipment, etc. necessary to immediately provide service, to, in effect, flip a switch, then that vendor would be deemed not to 'be ready' at the time of the proposal submission."

¶16.  The executive director rejected this interpretation of the answer to Question 51, relying on the fact that RFP 5000 included provisions for conversion to a new provider's services and finding that a vendor would be ready to meet the mandatory requirements upon submission of the proposal if ITS found that the vendor "satisfied the technical requirements for Centrex" at that time. Because C Spire had shown it was capable of providing the mandatory features at the time of its proposal submission, it met this specification. Further, the executive director found that

> AT&T's argument is patently disingenuous in light of its intimate knowledge of the telecommunications industry. AT&T, along with every other professional telecommunications services provider, understands that no provider other than the incumbent would be capable of immediately flipping a switch to provide the service required in RFP 5000. Any provider other than the incumbent would necessarily have to engage in considerable

9

implementation and conversion activities in order to put in place a system capable of actually providing services to governmental entities across the entire State.

¶17. In conclusion, the executive director found that "[t]here is nothing fair and open about AT&T's construing, much less ITS's developing, required specifications that eliminate all potential vendors save the incumbent. Yet this is what AT&T would have the State do so that, as AT&T states, AT&T would be 'the only remaining compliant offeror.'" The executive director found AT&T's protest to be without merit. AT&T requested review of the executive director's rejection of its protest. The ITS Board unanimously upheld the executive director's decision.

*Appeal*

¶18. AT&T timely filed a notice of appeal and complaint, followed by a corrected notice of appeal and complaint, in the Circuit Court of the First Judicial District of Hinds County. By consent of the parties, the action was transferred to the Chancery Court of the First Judicial District of Hinds County. AT&T filed a corrected notice of appeal and complaint in chancery court. ITS answered, asserting that all arguments not raised at the administrative level were waived. The chancery court granted a consent order that sealed the parts of the appellate record constituting AT&T's responses to RFP 5000.

¶19. After a hearing, the chancery court affirmed the decision of the ITS Board that upheld the executive director's decision. The chancery court found that the definition of Centrex in RFP 5000 did not refer to traditional, copper-based telephone service. The chancery court found, "[i]t is clear to the court that 'Centrex services' means *services* that were

10

provided—not the construction of the system itself, i.e., copper wiring." The chancery court also found that, given the statutory mandate of ITS to deliver the most efficient and flexible systems available, AT&T's offering was not efficient and flexible. AT&T offered an older, copper-line system, which it admitted would not be supported by the year 2020,[4] and its voice and data proposal was $32.8 million more than C Spire's. In contrast, C Spire's Centrex Platinum would use internet protocol wiring in combination with the customer's existing analog telephones and copper-wire telephone lines, saving the state millions of dollars and acting as a bridge technology to full Hosted VoIP service in the future. The chancery court found that, if AT&T had believed that the definition of Centrex was unclear, it could have requested clarification from ITS.

¶20.    Further, the chancery court found that, because RFP 5000 provided for conversion to a new service and requested that vendors provide a "detailed project plan with appropriate time lines," ITS did not require that vendors be ready to provide service to all sites on the day of the vendor's proposal submission. "It is clear to the court that the creators of the RFP understand, require, and are statutorily mandated to allow for the flexible installation of any system, over time, if needed, to be efficient in the long term, particularly if it saves the state significant amounts of money." The chancery court recognized that C Spire's proposal provided that it could sell access to AT&T's traditional copper system if the eighteen-month buildout it anticipated were delayed.

---

[4] On appeal, AT&T asserts that it made clear to ITS that, if selected, it was prepared to continue providing this service through 2020 and beyond.

11

¶21. The chancery court concluded that ITS's award of Category I to C Spire was not arbitrary and capricious. AT&T appealed. C Spire has filed an *amicus curiae* brief. AT&T argues that ITS's award of Catetory I to C Spire was unlawful. It requests that this Court reverse the decisions of the chancery court and the ITS Board and order ITS to rebid Category I with revised specifications of the services that vendors must provide. AT&T represents that, if the Court so orders, then it and other vendors plan to submit revised proposals.[5]

## STANDARD OF REVIEW

¶22. When reviewing the decision of an administrative agency, this Court determines whether the decision "(1) [w]as supported by substantial evidence; or (2) [w]as arbitrary or capricious; or (3) [w]as beyond the power of the lower authority to make; or (4) [v]iolated some statutory or constitutional right of the complaining party." ***Hill Bros. Constr. & Eng'g Co. v. Miss. Transp. Comm'n***, 909 So. 2d 58, 64 (Miss. 2005) (alterations in original) (internal quotation marks omitted) (quoting ***Landmark Structures, Inc. v. City Council for Meridian***, 826 So. 2d 746, 749 (Miss. 2002)). "[T]he burden of proof is on the party challenging an agency's action." ***Id.*** (citing ***Pub. Emps.' Ret. Sys. v. Marquez***, 774 So. 2d 421, 425 (Miss. 2000)).

---

[5] AT&T has filed an unopposed motion requesting that this Court take judicial notice of an ITS publication, the Mississippi Statewide Architecture & Infrastructure Plan, which is available on the ITS website. Because the Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" and state government publications are self-authenticating, we grant the motion. M.R.E. 201(b)(2), 902(5).

12

¶23.   "Substantial evidence . . . 'afford[s] a substantial basis of fact from which the fact in issue can be reasonably inferred.'" *Miss. Div. of Medicaid v. All. Health Ctr.*, 174 So. 3d 254, 261 (Miss. 2015) (alteration in original) (quoting *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1203 (Miss. 2003)). "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious." *Pub. Emps.' Ret. Sys. v. Howard*, 905 So. 2d 1279, 1284 (Miss. 2005) (quoting *Marquez*, 774 So. 2d at 430).

> "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." "An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles."

*Id.* at 1285 (citations omitted). Decisions that may be deemed "fairly debatable" are not arbitrary or capricious. *Elec. Data Sys. Corp.*, 853 So. 2d at 1203 (quoting *Miss. Bureau of Narcotics v. Stacy*, 817 So. 2d 523, 526-27 (Miss. 2002)). And a decision is "fairly debatable" when reasonable minds could differ on the propriety of the agency's decision. *Noble v. Sheffler*, 529 So. 2d 902, 906 (Miss. 1988).

¶24.   AT&T argues that the language of RFP 5000 is contract language that must be interpreted *de novo*. It contends that this Court has recognized that language in public contracts is afforded *de novo* review. *See A&F Props., LLC v. Madison Cty. Bd. of Supervisors*, 933 So. 3d 296, 301 (Miss. 2006) (addressing the Board's interpretation of a contract). But, as ITS correctly points out, RFP 5000 was not a public contract; rather, it was

13

a request for proposals. And the vendor with the selected proposal was not guaranteed a contract.

¶25. AT&T cites *J.H. Parker Construction Co. v. Board of Aldermen of Natchez*, 721 So. 2d 671, 677 (Miss. Ct. App. 1998), for the proposition that "[a]ny deviation from the bidding requirements that affects the integrity of the competitive process is beyond the discretionary power of the [agency]." But that case says also that an agency does possess some discretion to determine whether a vendor's proposal matches the agency's specifications. *Id.* Nonetheless, we have held that an agency will be found to have acted arbitrarily and capriciously if it accepted a bid on terms other than those authorized. *Richardson v. Canton Farm Equip.*, 608 So. 2d 1240, 1246 (Miss. 1992).

## DISCUSSION

**Whether ITS's selection of C Spire's proposal was arbitrary and capricious because the proposal did not meet ITS's specification for Centrex in Category I, Voice and Data in RFP 5000.**

¶26. AT&T contends that Centrex Platinum is not Centrex as defined by RFP 5000, which provided,

> Centrex - A business telephone service offered by the local exchange company (LEC) from a local central office. The word "Centrex" has become the industry standard name for this type of service.

AT&T makes several arguments positing that Centrex Platinum does not meet this definition.

¶27. First, it contends that RFP 5000 called for "industry standard" Centrex. It argues that because RFP 5000 called for industry standard Centrex, Centrex must be defined according to the telecom industry's understanding of the term. AT&T relies on *Craig v. Southern Bell*

14

*Telephone & Telegraph Co.*, 208 Miss. 881, 883, 45 So. 2d 732, 733 (1950), in which the State Tax Commission argued that cable was taxable under a statute providing for a tax on conduits. The Court held "that when the words of a statute have reference to a business, trade or profession, they should be given the meaning as understood by that business or trade . . . ." *Id.* (citing *Singing River Tire Shop v. Stone*, 21 So. 2d 580, 581 (Miss. 1945). In holding that the cable was not taxable, the Court looked to the telephone industry and reasoned that "cable" and "conduit" had well-defined meanings such that neither was understood to include the other. *Id.* at 733-34.

¶28.    We agree with AT&T's argument that the Court should look to the telecom industry to discern the meaning of undefined terms in the RFP. In fact, AT&T and ITS agree that Harry Newton's Telecom Dictionary, thirty-first edition, is authoritative in the industry, and both parties rely on its definitions of industry terms; moreover, the dictionary is cited authoritatively in the executive director's decision. Accordingly, this Court will rely on this resource for the definitions of industry terms. But, based on the RFP's plain language, we disagree with AT&T that RFP 5000 requested "industry standard Centrex." As the executive director recognized in his decision, that is not what RFP 5000 said. Rather, RFP 5000 defined Centrex as "[a] business telephone service offered by the local exchange company (LEC) from a local central office" and said that Centrex had "become the industry standard name for this type of service." Thus, RFP 5000 said that, for Centrex, the industry standard was "a business telephone service offered by the local exchange company (LEC) from a local central office."

15

¶29.	Because RFP 5000 defined Centrex as "a business telephone service offered by the local exchange company (LEC) from a local central office," if Centrex Platinum met this definition, then ITS was not arbitrary and capricious for accepting C Spire's proposal. AT&T argues vigorously that, for several reasons, Centrex Platinum is not Centrex.[6] We begin by addressing AT&T's contention that Centrex Platinum is not delivered from a local central office.[7]

   *A.	Whether Centrex Platinum is delivered from a local central office.*

¶30.	AT&T points to the definition of "central office" in the ITS Telecommunications Coordinator Handbook, which provides that a central office is "the local switching facility of a telephone company to which telephones are connected." The handbook further provides that "Centrex is central office exchange service" involving "a common carrier switching center in which trunks and loops are terminated and switched." AT&T argues that a central office is a building from which Centrex phone service is provided and that AT&T's proposal showed its two hundred such offices across the State from which it offers Centrex. But C Spire's proposal did not identify local switching facilities. Instead, C Spire would deliver Centrex Platinum from the C Spire Network Facility. AT&T argued that, because no other potential bidder would have known that ITS would accept a proposal that did not include central offices, the deviation affected the integrity of the bidding process.

_____

   [6] From this point on, when this opinion refers to "Centrex," it refers to "a business telephone service offered by the local exchange company (LEC) from a local central office."

   [7] Because AT&T did raise this argument in its protest, although in a cursory manner, the Court addresses it.

16

¶31. ITS argues that a central office is a telecommunications company's point of presence (POP) in a geographic area. It points out that AT&T's proposal described central offices and POPs interchangeably: "the Centrex solution provided by AT&T includes the following fundamental characteristics of a TDM-based solution: Over 200 points of presence or 'central offices' located within the State of Mississippi, each with its own hardware switches to direct voice traffic." C Spire presented twenty-three pages listing its POPs in the state of Mississippi.

¶32. AT&T contends that C Spire never claimed that it was offering Centrex Platinum from those POPs. AT&T points out that, in fact, C Spire's proposal acknowledged that central office buildings are not needed with Centrex Platinum. It says that C Spire's proposal does not show that Centrex Platinum is being offered from POPs. AT&T argues that C Spire's proposal said that Centrex Platinum is offered from three main network facilities, one in Jackson, Mississippi, one in Greenwood, Mississippi, and one in Atlanta, Georgia.

¶33. AT&T also argues that these POPs do not meet the ITS handbook definition of central office, "a local switching facility of a telephone company to which telephones are connected. Central Office is a common carrier switching center in which trunks and loops are terminated and switched." But the ITS handbook definition of "central office" was not included in RFP 5000. AT&T also relies on Newton's definition of "central office." And that definition makes clear that, in the telecom industry, the term "central office" is susceptible of two meanings: a local carrier-switching system or the building in which the switching system is installed.[8]

---

[8] Newton's provides that a "central office" is

17

AT&T argues that RFP 5000 requires that switching must occur in a physical building, and ITS argues that the meaning of "central office" in RFP 5000 is broader.

¶34.    AT&T also argues that because the language requesting Centrex in RFP 5000 was identical to the language requesting Centrex in RFP 4000 in 2005, ITS was requesting the same kind of Centrex provided by AT&T in response to the 2005 RFP. ITS responds that RFP 5000 used generic, broad language that prescribed functions for the Centrex service desired by the State, such as call forwarding, call hold, etc. Before the chancery court, it likened its request for Centrex in 2005 to requesting a cell phone in 2005 versus requesting a cell phone in 2017. The cell phone provided in response to the request would be a very different product in 2005 than in 2017, but both would constitute cell phones. ITS argues that the RFP's definition of Centrex was broad and generic to encourage the vendor community to "think outside the box."

¶35.    These arguments require further discussion of the nature of Centrex Platinum. According to the product overview provided by C Spire,

> C Spire's Centrex Platinum offering is a hybrid offering of its Hosted VoIP deployment powered by BroadSoft's Broadworks. C Spire's Hosted VoIP deployment is an IP-Centrex model where the exchange services reside on a soft-switch in the C Spire core network. C Spire's Centrex offering utilizes our

---

> A local exchange carrier switching system for connecting subscriber lines to subscriber lines, subscriber lines to trunks, and trunks to trunks for the purpose of originating/terminating calls over the public switched telephone network. . . . The term "central office" also refers to the building in which the aforementioned switching system(s) and other equipment are installed, including, for example, distribution frames, batteries, air conditioning and heating systems, etc.

*Central office*, Newton's Telecom Dictionary (31st ed. 2018).

owned core network and SIP[9] soft-switch to terminate leased copper pairs in central offices to owned hardware equipment and then converts the traditional copper to SIP. The voice services are provisioned and deployed via the same soft-switch as our Hosted VoIP deployment. This model simplifies the Centrex deployment, aligns services for all voice offerings available to the state and provides a logical low impact path to converting Centrex lines to Hosted VoIP lines.

¶36.    The product overview also provided a list of Centrex functions (call waiting, etc.). It is undisputed that the functions provided by Centrex Platinum are identical to those requested by ITS in the RFP for Centrex. Thus, no dispute exists that Centrex Platinum meets the State's needs. The dispute centers on whether Centrex Platinum meets the RFP's technical specifications. Also undisputed is that, as set forth in the product overview and as discussed at the hearing in chancery court, Centrex Platinum is IP Centrex. It is a hybrid between traditional analog telephone service and internet protocol (IP) telephone service. As described very simply in ITS's brief, "it uses a Hosted VoIP platform on C Spire's end until the voice traffic reaches the state office building, at which time it completely converts to a traditional, copper-based telephone service utilizing the same analog, copper lines and analog telephones the State has been using for decades." The conversion from IP to copper wire is

---

[9] SIP is

Session Initiation Protocol. SIP is the most important standard for setting up telephone calls, multimedia conferencing, instant messaging and other types of real-time communications on the Internet. SIP can establish sessions for features such as . . . call forwarding to be deployed over IP networks, thus enabling service providers to integrate basic IP telephony services with Web, email, and chat services. . . . An array of network gear including IP phones, IP PBXs, servers, media gateways and softswitches support SIP.

*SIP*, Newton's Telecom Dictionary (31st ed. 2018).

19

accomplished by means of a gateway, not something in a separate physical building. But unlike pure Hosted VoIP telephone service, Centrex Platinum has lower conversion costs because it does not require IP wiring and IP-compatible telephones to be installed in every state building.

¶37.  Newton's Telecom dictionary sets forth the following definition of IP Centrex:

> An IP (Internet Protocol) telephony service wherein Centrex service is offered to a customer over a broadband connection between the telephone company's central office and the customer premises. Voice traffic over the broadband link is carried as packetized voice, i.e. VoIP (voice over IP). The central office has either a softswitch that switches VoIP traffic natively, or it has a traditional class 5 end office switch[10] that connects to a carrier grade media gateway . . . that handles the VoIP traffic to and from the customer and does the protocol conversions necessary to exchange IP traffic with the class 5 switch. . . . If the customer has traditional analog telephones on its premises and wants to use them with IP Centrex, then it will need its own analog telephone adaptors (ATA) or media gateway to carry traffic to/from those phones via the broadband link. There [is] a variety of equipment, line, and LAN scenarios on the customer side; the main thing is that the customer will need to send/receive packetized voice on the broadband link to the CO (central office).

*IP Centrex*, Newton's Telecom Dictionary (31st ed. 2018). The definition of IP Centrex references media gateways, which "handle[] the VoIP traffic to and from the customer and do[] the protocol conversions necessary to exchange IP traffic with the class 5 switch." Newton's provides the following helpful definition of "media gateway:"

---

[10] Newton's defines "class 5 office" as "[a]n end office. Your local central office. . . . A class 5 office is a local central office that serves as a network entry point for station loops and certain special-service lines." *Class 5 office*, Newton's Telecom Dictionary (31st ed. 2018).

A "switch" is "[a] mechanical, electrical, electronic or optical device which opens or closes circuits, completes or breaks an electrical or optical path, or selects paths or circuits. . . . A switch looks at the incoming data (voice data, or data data) to determine the destination address." *Switch*, Newton's Telecom Dictionary (31st ed. 2018).

20

A media gateway . . . is a fancy name for the new "central office" of the new IP-based telecom industry. Think of it as third generation central office. The first generation was when all phone calls were analog and central offices were electromechanical. The central office's job was to connect one phone conversation through the network to the party at the other end. They called it circuit switched. And it was all very mechanical.

. . . .

The second generation occurred when the industry turned digital. At some point in its progress, each phone conversation was converted to a stream of 64,000 bits per second. The central office's function then became to draw out one digital conversation from a stream of many and connect that one conversation to the person at the other end.

. . . .

In the 1990s, the world changed again. The Internet appeared, first as a way of joining University computers, then as a crude email system, then the world wide web took hold and everything Internet exploded. And the Internet got bigger than the traditional Public Switched Telephone Network (PSTN). . . . As things you could [do] exploded on the Internet and as the price of doing them plummeted, the thought occurred to the traditional phone industry that it would make enormous sense if somehow the PSTN morphed into the Internet, gaining both the Internet's efficiencies and the PSTN's ubiquity. But to merge the two (or at least bits and pieces of the two), you needed a third generation "switch" that will handle all the various telecom streams—from packet switched IP (Internet Protocol) to traditional TDM (Time Division Multiplexed) streams and all those in between. The media gateway controlle[r] is that switch. It's also called media gateway, a call agent or a softswitch, to reflect the fact that its switching is done in software, not hardware as in previous switching generations.

*Media gateway*, Newton's Telecom Dictionary (31st ed. 2018).

¶38.    As noted, Centrex Platinum is IP Centrex, a hybrid Centrex solution. This Court finds that ITS's decision that Centrex Platinum complies with RFP 5000's definition of Centrex as "a business telephone service offered by the local exchange company (LEC) from a local central office" was supported by substantial evidence and, at the least, was fairly debatable. Although ITS used the same language for Centrex in RFP 5000 as it had used in RFP 4000,

21

ITS made clear in RFP 5000 that it sought innovative solutions across all eleven functional categories and wanted proposals that made use of modern technological developments. Centrex Platinum delivers IP telephone service to a state office building, where it is converted via a gateway to traditional copper wire telephone service. Newton's definitions of "central office," "IP Centrex," and "media gateway" make clear that the term "central office" has evolved with technological advancements and now signifies something broader than just a physical building where hardware switching occurs. RFP 5000 did not specify traditional Centrex, legacy Centrex, TDM, copper wire, or otherwise indicate that the voice services requested in Category I were limited to the same technology that AT&T has been providing. Accordingly, we hold that ITS's decision that Centrex Platinum satisfied the specification for Centrex was supported by substantial evidence and was not arbitrary and capricious.

> B.  *Whether Centrex Platinum is not Centrex because it is really Hosted VoIP.*

¶39.  RFP 5000 requested Hosted VoIP in Category VI. AT&T argues that the Centrex Platinum proposed by C Spire should not have been selected for Category I because it fit within Category VI, Hosted VoIP. The RFP for Category VI provided,

> The State currently utilizes AT&T's Hosted Voice Services (HVS) for hosted Voice over IP (VoIP) telephone service. While this has not been widely rolled out across the State, there are approximately 2000 seats in use, including one of the State's universities.
>
> It is the State's intent to replace the existing contract with a new contract for statewide managed and hosted VoIP telephone service. This contract may be

22

leveraged by all of the various logical[11] entities in the State which include[]
state agencies, libraries, institutions of higher learning, community colleges,
K-12 schools, and local governments.

AT&T points to the following vendor questions and ITS answers that amended RFP 5000:

> **Question 55:** Please specify how the Centrex service referenced is delivered
> today? Would the State consider an option to convert existing Centrex services
> to IP?
>
> **Response:** The Centrex service is delivered to the location by the incumbent
> provider over copper facilities. The State is considering a future conversion
> from Centrex to a hosted VoIP solution that is being bid in Category VI;
> however, on day one of the new contract, Centrex must be available for use.
>
> **Question 60:** Is there consideration to convert existing Centrex or POTS[12]
> supported location to Hosted VoIP or SIP trunking?
>
> **Response:** The State is considering a future conversion from Centrex to a
> hosted VoIP solution that is being bid in Category VI.

¶40.    AT&T argues that because ITS requested Hosted VoIP in a separate category and made clear in the responses to Questions 55 and 60 that Hosted VoIP was being bid in Category VI, vendors would not have known they could have proposed a hybrid Centrex solution in Category I that relied in part on Hosted VoIP. We find that because, as discussed above, ITS's decision that a hybrid Centrex solution complied with the specifications for Category I was at least fairly debatable, its decision was not arbitrary and capricious. As ITS and the chancery court found, Centrex Platinum is not the pure Hosted VoIP called for in

---

[11] In the telecommunications context, "logical" refers to "the way the software sees it," as opposed to how something is physically connected. *Logical*, Newton's Telecom Dictionary (31st ed. 2018). For example, an email address is a logical address because it has no fixed location in the physical world. *Id.*

[12] POTS is an acronym for "plain old telephone service." *POTS*, Newton's Telecom Dictionary (31st ed. 2018).

23

Category VI because Centrex Platinum does not require IP wiring and telephones in state office buildings but instead relies on the state's existing analog telephones and wiring. ITS's decision that Centrex Platinum did not meet the specifications for Hosted VoIP in Category VI was fairly debatable and not arbitrary and capricious.

¶41.    AT&T also argues that Centrex Platinum meets the industry's definition of Hosted VoIP because it includes a certain component. Again, resolution of this argument requires analysis of telecom-industry specific definitions. Because Category VI provides no definition of Hosted VoIP, the parties rely on the definition in Mississippi Code Section 19-5-303(q), which provides, in pertinent part, that

> Voice over Internet Protocol service, which is service that enables real-time, two-way voice communications, requires a broadband connection from the user's location, *requires Internet protocol compatible customer premises equipment*, and allows users to receive calls that originate on the public service telephone network and to terminate calls to the public switched telephone network.

Miss. Code Ann. § 19-5-303(q) (Rev. 2012) (emphasis added).

¶42.    AT&T argues that Centrex Platinum meets this definition because the gateway that converts analog to IP constitutes "Internet protocol compatible customer premises equipment." At a hearing before the ITS board, C Spire's attorney discussed the gateway, saying that

> What C Spire's proposed is one of these. It's a big converter. On the back, it's got a slot. It says "voice." And then to the voice slot, plugs that thing right there. Into that big punch down block go all the copper lines that come in the building. So those Centrex seats don't have to change phones, they don't have to pay for new wire. They get to keep their Centrex service.

24

On the other side, the thing here that says "gig port." Into that, you plug an ethernet cord. TDM comes in, IP goes out, you have hybrid Centrex service. That's what C Spire provided, that's what we bid, and that's what was $33 million cheaper.

AT&T argues that the "big converter" is internet protocol compatible customer services equipment, meaning that Centrex Platinum meets the definition of Hosted VoIP under Section 19-5-303(q).

¶43.    ITS points out, accurately, that AT&T did not raise its argument about the gateway in its protest and that the argument was not raised until AT&T's reply brief in the chancery court. In the federal arena, the general rule is that courts will not review a question that was not presented to or passed on by the administrative agency. *Myron v. Martin*, 670 F.2d 49, 51 (5th Cir. 1982). A court might undertake review of such a question in exceptional circumstances. *Id.* This Court has said that

> [w]e reserve the right to consider an issue that was not raised before an administrative agency where . . . the facts are undisputed and the issue is one that would allow an erroneous application of a statute, and where failure to address such issue will result in a possible deprivation of substantive rights.

*Dean v. Pub. Emps.' Ret. Sys.*, 797 So. 2d 830, 837 (Miss. 2000). In *Dean*, this Court found that the Public Employees' Retirement System had violated its governing statutes by allowing members of the Medical Board to sit as hearing officers in review of the Medical Board, an argument that was not raised until the appeal to circuit court. *Id.* at 836-837.

¶44.    AT&T's argument about whether Centrex Platinum's gateway was customer premises equipment, making Centrex Platinum Hosted VoIP, requires the resolution of disputed facts and is precisely the type of issue that should have been presented to ITS for resolution before

25

being raised on appeal. Therefore, the argument is barred. Notwithstanding the fact that the argument was not raised, we find that it is without merit. AT&T argues that two Federal Communications Commission (FCC) decisions, one from 2007 and one from 2008, held that "anywhere a customer must use an internet adapter to have telephone service would definitely qualify as Interconnected VoIP." *In re Cardinal Broadband, LLC*, 23 FCC Rcd. 12224, 12225 (Aug. 15, 2008). In its *IP-Enabled Services* order, the FCC defined interconnected VoIP as requiring IP-compatible customer premises equipment, including "terminal adapters, which contain an IP digital signal processing unit that performs digital-to-audio and audio-to-digital conversion and have a standard telephone jack connection for connecting to a conventional analog telephone[.]" *In re IP-Enabled Servs.*, 20 FCC Rcd. 10245, 10257 n.77 (June 3, 2005). AT&T argues that C Spire's gateway is just such a terminal adapter, meaning that Centrex Platinum fits within the FCC's definition of interconnected VoIP.

¶45. ITS argues that neither RFP 5000 nor Section 19-5-303(q) defines "customer services premises equipment" as including the gateway. ITS argues that Newton's Telecom Dictionary defines "customer-premises equipment" as "CPE. Terminal equipment—telephones, key systems, PBXs, modems, video conferencing devices, etc.— connected to the telephone network and residing on the customer's premises." *Customer services premises equipment*, Newton's Telecom Dictionary (31st ed. 2018). The definition of CPE says that the definition has changed from "equipment on the customer's premises which had been brought from a vendor who was not the local phone company" to

26

telephone equipment—key systems, PBXs, answering machines, fax machines, etc.—which live on the customer's premises. . . . These days the phone company ends their service and their cable at a box or punchdown block which they call the demarc point—demarcation point. They're responsible for problems to the demarc point. You're responsible for problems from the demarc point on—unless you pay them to take care of your CPE wiring and/or phone equipment.

*CPE*, Newton's Telecom Dictionary (31st ed. 2018). ITS argues that the gateway, a/k/a the "big converter box," is a "box or punchdown block" on the vendor's side of the demarcation point and, thus, is not customer service equipment under the current definition. AT&T's argument is barred because it was not raised until the chancery court appeal; notwithstanding the bar, it is without merit because, as ITS argues, the current industry dictionary definition of customer services equipment makes it at least fairly debatable that Centrex Platinum does not classify as VoIP as outlined in Section 19-5-303(q).

      *C.     Whether, by selecting C Spire, ITS did not comply with the timeliness requirement of Category I.*

¶46.    AT&T points out that, in response to questions from vendors, ITS told bidders that "vendors must be able to meet mandatory requirements[13] at the time of the RFP proposal submission," and "on day one of the new contract, Centrex must be available for use." AT&T argues that, with these responses, ITS amended RFP 5000 to require that the vendor selected for Category I be able to provide Centrex service on the day it submitted its proposal to ITS.[14] Because C Spire admitted it could not deliver Centrex Platinum to every customer in its

---

[13] Centrex was a mandatory requirement of RFP 5000.

[14] The Questions and Clarifications memorandum indicates that ITS's responses to vendor questions became part of RFP 5000's specifications.

network inventory on day one of the contract and because it projected an eighteen-month buildout, AT&T argues that ITS should have disqualified C Spire's bid.

¶47. ITS argues that, as the executive director found, the conversion timelines in RFP 5000 show that a vendor has eighteen months to finish implementing statewide service. Indeed, RFP 5000's project implementation start-up date was January 1, 2018, and the project go-live deadline was June 30, 2019. ITS contends that, as the executive director found, the response requiring a vendor to be able to meet the mandatory requirements on the date of its RFP proposal submission means that the vendor must have those services available once the contract is signed. Further, ITS argues that AT&T's interpretation of the timeliness requirement would mean that only AT&T, the incumbent, could have had "all of the cabling, wiring, equipment, etc." in place to "flip a switch" on the day of its RFP submission, resulting in a monopoly for AT&T. Finally, it is undisputed that any provider can resell AT&T's telephone service, meaning that C Spire actually could provide AT&T's service on day one of the contract.[15]

¶48. In response, AT&T posits that C Spire's argument is contrary to the plain language of the RFP response. But AT&T's argument ignores the conversion timeline of RFP 5000.

---

[15] AT&T argues that, because everyone knows that C Spire can resell AT&T's telephone service, the executive director was disingenuous when he found that no provider other than the incumbent immediately could provide the services requested in RFP 5000. Of course C Spire could not have resold AT&T's service on the day the RFP was submitted because it had no contract with the State to provide any service at all at that point. But it could have resold AT&T's service on day one of the contract term. Because the executive director's decision focused on AT&T's argument that Centrex Platinum was not available on day one, we find no flaw in the executive director's finding that AT&T essentially argued it was entitled to a technological monopoly by interpreting the RFP to require all the provider's services be available for use by the State on the day of the RFP submission.

Although the RFP is not a contract, applying, as AT&T urges, the plain language rule from contract interpretation does not yield a favorable result for AT&T. The Court's duty is to read a contract as written, and the contract must be examined as a whole to determine the parties' intent. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990). Language that might be susceptible of being construed to conflict must, if possible, be harmonized to effectuate the parties' intent. *Id.* Considering RFP 5000 as a whole, the plain language of the conversion timeline told vendors that the State allowed an eighteen-month buildout between the time the contract was signed and the date the project was set to "go live." ITS was not arbitrary and capricious in analyzing the responses to vendor questions in light of the conversion timeline. Moreover, as the executive director recognized, if ITS had interpreted the responses in a way that only AT&T could have satisfied Category I's requirements, that would have defeated the RFP's purpose of seeking competing proposals from the vendor community. Further, because it is undisputed that C Spire could, in fact, have resold AT&T's telephone service on day one of the contract, even construing the responses in the manner urged by AT&T avails it nothing.

## CONCLUSION

¶49.    We hold that ITS's decision that C Spire's proposal matched the specifications for Centrex in Category I of RFP 5000 is at least fairly debatable. Therefore, ITS's selection of C Spire's proposal was not arbitrary and capricious and was supported by substantial evidence.

¶50.    **AFFIRMED.**

29

**KING, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. RANDOLPH, C.J., NOT PARTICIPATING.**